IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


JEROME D. JOHNSON,
    Plaintiff,


VERSUS          CIVIL ACTION NO: 1:07cv539LG-JMR


DONALD A. CABANA, et al.,
    Defendants.

---

## DEPOSITION OF JEROME D. JOHNSON

---

Taken at the Pascagoula Restitution
Center, 1721 Kenneth Avenue, Pascagoula,
Mississippi, on Friday, March 28, 2008,
beginning at 10:00 a.m.


**APPEARANCES:**

    JEROME D. JOHNSON
        PLAINTIFF PRO SE

    JON S. TINER, ESQUIRE
    Dukes, Dukes, Keating & Faneca, P.A.
    2909 13th Street, Sixth Floor
    Gulfport, Mississippi  39501
        ATTORNEY FOR WARDEN DONALD A. CABANA,
        EARL LEONARD, CAROLYN PENDERGAST,
        STEVE CAMPBELL, GEORGE H. PAYNE, JR.,
        KENNETH ROGERS, NATHAN ELLSBERRY AND
        ELAINE LEGE, ALL OFFICIALLY AND IN
        THEIR INDIVIDUAL CAPACITIES

**EXHIBIT**

tabbies®  "A"

**APPEARANCES:** (Continued)

        IAN A. BRENDEL, ESQUIRE
        Law Offices of Jim Davis
        1904 24th Avenue
        Gulfport, Mississippi 39501
          ATTORNEY FOR RICK GASTON


**REPORTED BY:**

          Lori R. Migues, CSR No. 1245
          Simpson Burdine & Migues
              Post Office Box 4134
          Biloxi, Mississippi 39535
          LMigues@SBMreporting.com
              (228) 388-3130

1     Q.   To New York?

2     A.   Niagara Falls.

3     Q.   Niagara Falls.  Still waiting to come

4 down to the Gulf Coast?

5     A.   And then Harrison County picked me up.

6     Q.   And Harrison County picked you up?

7     A.   Yes, sir.

8     Q.   And where did you go directly --

9     A.   To Harrison County jail.

10    Q.   Harrison County Adult Detention Center?

11    A.   Correct.

12    Q.   And this was all on charges of your

13 forgery here on the Gulf Coast?

14    A.   Yes, sir.

15    Q.   Okay.  And so they hadn't prosecuted you

16 yet for that claim?

17    A.   I was found guilty in 2005.

18    Q.   So you were awaiting your trial for

19 forgery at the Harrison County Adult Detention

20 Center?

21    A.   During that time in 2004, correct.  And

22 I was sentenced 2005, June the 22nd of 2005.

23    Q.   And you were sentenced in 2005.  And

24 what was your sentence for?

25    A.   I was sentenced to ten years running

1  concurrent on Count I, ten years running

2  concurrent on Count II with two years to serve.

3      Q.   And was that to serve at the Harrison

4  County Adult Detention Center?

5      A.   No, sir.  That was to serve in the

6  Department of Corrections.

7      Q.   Okay.  Anywhere within the Department of

8  Corrections?

9      A.   Correct.

10      Q.   So when you were convicted and your

11  sentence came down, where did you go after that?

12      A.   I was supposed to go to the restitution

13  center, come straight to the restitution center.

14      Q.   Here in Pascagoula?

15      A.   Correct.  But Hurricane Katrina

16  happened.  So I stayed at Harrison County Work

17  Center.  I stayed there until someone stole a pair

18  of gloves of mine, and I asked to be sent back to

19  ADC.  I went back to the ADC around

20  September 2005.

21      Q.   So after the hurricane, you requested to

22  go back to the adult detention center?

23      A.   While I was at the Harrison County Work

24  Center, correct.  I was out helping with the

25  relief and passing out ice and water.  Prior to

1   that, I was working the gas pumps.  But what
2   happened was while I was out helping with relief
3   of passing out ice and water, I came back.
4   Someone went in my locker and stole my gloves.  I
5   was very upset over the fact because my sister had
6   sent me that.  I don't have no family here, so it
7   was sent for me at the time from Fort Riley,
8   Kansas.  And I didn't want to get into any
9   trouble, because my temper was flared up.  I asked
10  to -- you know, I packed my stuff.  I asked them
11  to bring me back to the ADC.
12       Q.    That's the Harrison County Adult
13  Detention Center?
14       A.    Correct.  I stayed there for about a
15  week.  My misses called back to have them -- to
16  bring me back to the Harrison County Work Center
17  to go back --
18       Q.    You said your misses?
19       A.    Yes, sir.
20       Q.    Who is your misses?
21       A.    Kerri, her name is Kerri Barton.
22       Q.    And what do you mean by your misses?
23       A.    My fiancee.
24       Q.    Kerri what?
25       A.    Barton.

1      Q.    Okay.  And so she called on your

2  behalf --

3      A.    Correct.

4      Q.    -- to be transferred?

5      A.    To be transferred back to the work

6  center after I done calmed down.

7      Q.    And then what happened after that?

8      A.    Well, I was never transferred back there

9  because that one year, within that one year of me

10  supposed to be going to the restitution center was

11  department of correction period.  So what happened

12  was I was shipped to Rankin County.

13          I went to Rankin County, went through

14  their orientation.  And I went to Parchman, Camp

15  25, and I discharged from Camp 25.  They did my

16  itinerary for me that Friday for me to go back

17  home to Canada, which never happened because my

18  sentencing order said I was supposed to do that

19  within that year restitution.

20          So they brought me down here to

21  Pascagoula Restitution Center March the 6th, '06.

22  I came here, and no one knew nothing about me

23  coming here.  So I didn't stay at this restitution

24  center because they didn't have no bedding.  I

25  spent a night in Pascagoula ADC.  And on March the

1   7th, '06, Ms. D, who used to work here -- her name

2   is Diane something. I can't just remember her

3   name. She's over here at the probation and parole

4   office. Her and Simon, the probation officer for

5   Gulfport, came and picked me up, and they took me

6   to Hinds County Restitution Center. I went there

7   to Hinds County Restitution Center on the 8th. I

8   started working for Bomack Electric, and I stayed

9   there until June 22nd of 2006.

10      Q.   And then what happened then?

11      A.   While I was out for work -- you're not

12  allowed to have digital cameras or anything like

13  that. I wasn't aware of that. But while I was at

14  work, someone brought me a digital camera, dropped

15  it off. I explained that situation to the

16  commander and officer, Ms. Robinson, at the time.

17  I talked to her; however, I was packed. I was

18  sent back to Harrison County jail. I went in

19  front of Harrison County jail.

20          At that time Judge Simpson, he told

21  Mr. Simon to get -- find out what was going on

22  with that situation. After that, I was told I was

23  going to go right back to the restitution center.

24  And while waiting to go back, to return back to

25  the restitution center, September the 1st, I was

1    here.

2         Q.    So you file an inmate request sheet?

3         A.    Yes, sir.

4         Q.    And you say you did that on

5    September 4th?

6         A.    Starting September the 4th.

7         Q.    And how many did you file?

8         A.    Well, that day, I wrote one that day.

9         Q.    To whose attention was it?

10        A.    That was to Captain -- well, at that

11   time, to Sergeant Lege concerning the contraband

12   while I was in the hole.

13        Q.    So it didn't relate to the sexual

14   assault charge?

15        A.    I wasn't aware of the sexual assault

16   charge until the 5th.

17        Q.    So that was just concerning the

18   contraband?

19        A.    Yes, sir.

20        Q.    When did you start sending requests

21   regarding the sexual --

22        A.    Well, that day, that Tuesday when I came

23   back to the zone, I mean, back to B-D, that

24   Tuesday.

25        Q.    Okay.  And you sent the first one then?

1    A.   I sent more than just one.  I sent a

2  couple of them.  I probably sent out five of them

3  then.

4    Q.   You sent five.  And do you know what

5  date you sent those?

6    A.   That night.

7    Q.   So September 5th --

8    A.   Yes, sir.

9    Q.   -- five were sent out?

10    A.   Yes, sir.

11    Q.   To whom?

12    A.   The officer that comes by that picks

13  them up, I sent it out to him, but I sent them out

14  to -- who is he?  That was -- no, to Ms. Lege, to

15  Sergeant Lege.

16    Q.   So you gave -- all five were sent to

17  Sergeant Lege?

18    A.   They were addressed to Ms. Lege.

19    Q.   And so one of them we know dealt with

20  the contraband?

21    A.   Yes, sir.

22    Q.   And the other four you're saying dealt

23  with --

24    A.   Dealt with the sexual assault.

25    Q.   -- the sexual assault?  And do you have

1  copies of those?

2  A. No, sir. I just recently just got

3  copies back -- well, not recently, in 2007 just

4  got copies back from the ones that I did send out.

5  Q. Okay. I know in your complaint you said

6  that you filed written requests and grievances to

7  the staff, but the first recorded one that we have

8  is the one of February 21st, 2007.

9  A. That's when they started responding back

10 to grievance and requests. They didn't -- the

11 requests themselves stayed -- I mean, they stayed

12 stacked up. There are plenty of them. They

13 usually had an inmate that handled all the

14 requests. But the grievance, they had -- the lady

15 who handled that was the preacher's wife. She's

16 the one that started responding. That was like

17 the first time I got a response.

18 Q. Well, that's the only record we have is

19 this February 21st, 2007 as the first inmate

20 grievance that you filed. Did you file any other

21 grievances besides that?

22 A. Yes, sir.

23 Q. And were they in the form of request

24 forms or grievances?

25 A. Grievance.

1  you did the February 21st after the ones on the
2  15th?
3       A.   Correct.
4       Q.   Okay.  All right.  So February 21st.
5  Then I'm going to turn to the next one.  This is
6  the First Step Response Form --
7       A.   Yes, sir.
8       Q.   -- which was responded to by Captain
9  Rogers, dated February 23rd, 2007.  That's two
10 days after your grievance form of the 21st,
11 correct?
12      A.   Correct.
13      Q.   And in his response, he indicates that
14 you will need to contact your attorney or CID
15 about your case; is that correct?
16      A.   Uh-huh.  That's correct.
17      Q.   Okay.  And did you do so?
18      A.   I started sending requests and more --
19 you can't file a grievance.  I think I did send a
20 grievance to CID, too.
21      Q.   Can you file grievances to the CID
22 through the jail?
23      A.   I don't think you can, but I think I
24 sent them a grievance.
25      Q.   So you tried to contact CID through the

1   jail?

2        A.    Yeah.   Because every time I tried to get

3   in contact with CID -- well, when he sent me back

4   this and told me that I need to contact CID, when

5   I'd write CID, I'm not getting a response back

6   from none of my requests.   So at that time I filed

7   a grievance, too, and I didn't get a response back

8   on the grievance.

9        Q.    So you filed another grievance?

10       A.    Yes, sir.

11       Q.    Okay.   But, again, did you contact CID

12  outside of the detention center?

13       A.    I have no way of doing that.

14       Q.    You have no way to write them a letter?

15       A.    No, sir.

16       Q.    You're not allowed to write letters?

17       A.    No.   I didn't -- I mean, I can write

18  letters, but I did not contact them through that.

19  I wrote a letter to George Payne's secretary.

20       Q.    When did you do that?

21       A.    I did that sometime -- I did that

22  sometime in this year, in this month while I was

23  over there on B-D.

24       Q.    Okay.   So that would have been

25  February 2007?

1        A.    Yes, sir.

2        Q.    And that was a letter to George Payne?

3        A.    Yes, sir.

4        Q.    And how did you deliver that letter to

5    him?

6        A.    I mailed that out.

7        Q.    All right.  In this First Step Response

8    Form it also asks for you to contact your

9    attorney.  Would that have been Kay Wilkerson?

10       A.    I called Ms. Kay Wilkerson.

11       Q.    You phoned her?

12       A.    Yes, sir.

13       Q.    When did you do that?

14       A.    Well, after I got this grievance.

15       Q.    And did you speak with her?

16       A.    Yes, sir.  And she told me there's

17   nothing that she can do until I get indicted and

18   that she was my attorney just for the preliminary

19   hearing and that when I get indicted that I will

20   be given an attorney.

21       Q.    So you contacted her by phone when?

22       A.    I contacted her a lot.

23       Q.    Okay.  When did you first contact her?

24       A.    In February.

25       Q.    And then after that?

1    Q.    But you don't have any personal

2    knowledge of it one way or another?

3        A.    Of neither, of her concealing it or not.

4        Q.    Okay.  I'll let Mr. Brendel go through

5    Mr. Gaston's issues here in a moment.

6            Steve Campbell is another person you've

7    sued.  It says that Steve Campbell became a major

8    player because he refused to respond to numerous

9    requests I submitted.  Did you submit anything to

10   Officer Campbell directly?

11       A.    Officer Campbell, at that time when I

12   found out who he really was, is the captain of

13   CID.  And I've sent numerous requests and

14   grievance with his name on it and still -- also to

15   Ms. Carol Pendergast and received no responses.

16       Q.    Okay.  I need you to, the best you can,

17   identify when and where those grievances were sent

18   to Officer Campbell.

19       A.    This would have been around February.

20       Q.    Of 2007?

21       A.    Yes, sir.

22       Q.    That would be the first time you

23   attempted to contact Steve Campbell?

24       A.    This would be the first time I sent a

25   grievance to Mr. Campbell.  I sent requests to

1    A.    Resulted in deliberate indifference --

2    Q.    Yes.

3    A.    -- depriving the plaintiff's

4  Constitutional rights.

5    Q.    I mean, are you really claiming here

6  that you're holding Payne responsible for the

7  actions of his employees?

8    A.    For the action of the employees not

9  following policies and procedures that's set up by

10  him.

11    Q.    But Defendant Payne, I mean, Sheriff

12  Payne really was not involved in this personally

13  at all.

14    A.    Well, I contacted him and informed him

15  what was going on.  I received no response back

16  from him.  He would be -- I feel he would be more

17  responsible towards Cabana because he hired Donald

18  Cabana.

19    Q.    So you're holding Sheriff Payne

20  responsible for the actions or inactions of Warden

21  Cabana?

22    A.    Correct.

23    Q.    And then how is Warden Cabana personally

24  involved, just by not responding to your requests?

25    A.    Well, not only that, not responding to

1    requests or grievance or actually doing something

2    about the situation.

3         Q.   Okay.   So his failure to act?

4         A.   Correct.   I guess just as I stated here,

5    failure to oversee the people who caused the

6    wrong, such as hiring unqualified people or

7    failing to adequately train the staff or create a

8    policy or custom that allowed the wrong.

9         Q.   All right.   Okay.   So what's stated

10   there?

11        A.   Sir?

12        Q.   What's stated there is what you're

13   claiming?

14        A.   Yes, sir.

15        Q.   All right.   As to Defendant Rogers,

16   Captain Rogers -- this is on Page, I guess, 6 --

17   you're claiming that he failed to do anything to

18   stop or fix the wrong?

19        A.   Yes, sir.   And not only that he's -- and

20   that didn't come to my knowledge till way later

21   that also he's the captain of security, and he

22   answered my grievance.   And as the captain of

23   security, he should have made sure everything

24   was -- should have been done much better than what

25   it was.

1     Q.   So for his job duties?

2     A.   Yes, sir.

3     Q.   Okay.  And then Nathan Ellsberry, you

4 said, failed to do anything to stop or fix the

5 wrong.

6     A.   And he was present the time that I was

7 in the -- talking to Sergeant Leonard.  He was

8 there.  He was aware of what was going on, and he

9 wouldn't do nothing.

10    Q.   Okay.  And then you add -- I think the

11 last one is Lege.

12    A.   Uh-huh.

13    Q.   Knew of the wrongs.  How so?  It says

14 Lege knew of the wrong but did nothing to remedy

15 the wrong.

16    A.   She's a sergeant.  And then that's the

17 same sergeant that came and talked to me while I

18 was in B-D, saying that I'm being charged with

19 contraband.  I've never received an RVR for this

20 contraband.  I never seen an RVR for the sexual

21 battery.  Captain Rogers said that a rule

22 violation you really don't -- you don't want an

23 RVR, but policies and procedures that are set up

24 stated that I'm entitled to an RVR, that

25 Officer -- that Sheriff George Payne authorized.

1    problem.  I've been in that jail since December

2    the 12th, 2004.  I never had an RVR.  I never

3    caused any problems to nobody.  Here I am in a

4    location where -- and I'm talking about it

5    started -- it was -- before it actually got out of

6    hand, I don't know if you know about it, but all

7    the guys known as our section, in that area, in

8    B-A was jumped by these same four individuals.

9    They jumped all the white guys just because they

10   was white, every last one of them, in November

11   because they were white.

12       Q.   This is November 2007?

13       A.   Yes, sir.

14       Q.   This is after your incident?

15       A.   This is after my incident.  It made the

16   news -- I mean, well, the newspaper.  But they

17   were only jumped because they were white.

18       Q.   Okay.  But who are you holding

19   responsible for --

20       A.   I'm holding Dr. Cabana responsible.

21       Q.   Cabana, okay.  And that's for what

22   reason?

23       A.   I'm holding Sheriff George Payne

24   responsible.  I'm holding Harrison County Board of

25   Supervisors responsible, whoever is responsible

1   for the security.

2       Q.   For security reasons?

3       A.   Because the doors don't properly lock.

4   The intercom doesn't work at all, officers not

5   checking on inmates every -- I mean, that's a high

6   risk area.  It should be you should check on an

7   individual every 30 minutes.  I can't tell a

8   person how to run the zone, but only to prevent

9   one of the officers being killed or an inmate

10  being killed.

11      Q.   Are you holding Officer Evan Hubbard

12  responsible?

13      A.   No.  Because Officer Evan Hubbard,

14  that's the kind of officer they need.  He actually

15  did something.

16      Q.   I'm just trying to find out who your

17  claims are against.

18      A.   No, sir.  I'm not holding him

19  responsible.

20      Q.   And then in your discovery that you

21  answered to Harrison County, let's see here, you

22  make a claim that William Martin was negligent.

23      A.   I wrote Mr. Martin.  I wrote him a

24  letter explaining to him everything that was going

25  on.  I wrote him a letter responding -- telling

1      A.    So I can ask Lieutenant Falk am I under

2    a court order to have a deposition without an

3    attorney.

4    MR. BRENDEL:

5         Let's go off the record for a moment,

6    please.

7         (Off the record.)

8    MR. BRENDEL:

9      Q.    Now, at the time that you allege all

10    these violations of your constitutional rights,

11    you would have still been incarcerated in Harrison

12    County during that time anyway, right?

13      A.    Yes, sir.

14      Q.    Okay.  In fact, as we sit here today on

15    March 27th, 2008, are you still serving time in

16    Harrison County?

17      A.    No, sir.

18      Q.    Why are you here right now?

19      A.    Pay restitution.

20      Q.    But that's related to a crime that was

21    committed in Harrison County?

22      A.    Correct.  But your question asked me

23    would I still be here, locked up for 434 days, two

24    years later.

25      Q.    No, that wasn't my question.